# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

MELISSA HARDAN,

             Plaintiff,

    vs.

NYE COUNTY; SHERIFF ANTHONY L.
DeMEO, individually; ASSISTANT SHERIFF
RICHARD MARSHALL, individually;
LIEUTENANT MARK MEDINA,
individually; OFFICER CORY FOWLES,
individually,

             Defendants.

Case No.: 2:15-cv-0470-GMN-PAL

**ORDER**

      Pending before the Court is a Motion for Summary Judgment (ECF No. 36), filed by Defendants Nye County, Sheriff Anthony L. DeMeo ("DeMeo"), Assistant Sheriff Richard Marshall ("Marshall"), Lieutenant Mark Medina ("Medina"), and Officer Cory Fowles ("Fowles") (collectively, "Defendants"). Plaintiff Melissa Hardan ("Plaintiff") filed a Response (ECF No. 45), and Defendants filed a Reply (ECF No. 49).

      Also pending before the Court is Plaintiff's Partial Motion for Summary Judgment (ECF No. 38), to which Defendants filed a Response (ECF No. 41), and Plaintiff filed a Reply (ECF No. 46). For the reasons stated below, the Court GRANTS in part and DENIES in part Defendants' Motion for Summary Judgment, and DENIES Plaintiff's Partial Motion for Summary Judgment.

## I.    BACKGROUND

      This case arises out of the fatal shooting of Plaintiff's dog on March 22, 2013. (Am. Compl., ECF No. 28). Initially, Fowles went to Plaintiff's home to investigate a complaint of child abuse that Plaintiff filed with her son's elementary school about a substitute teacher

spanking her son. (Fowles' Dep. 13:1–4, 14:9–11, Ex. B to Lee Decl., ECF No. 37); (Suspected Child Abuse Report Form, Ex. 2 to Pl. Partial MSJ, ECF No. 38-2). Plaintiff has a large property in Pahrump, Nevada, which is enclosed by a fence. (Hardan Dep. 15:18–20, Ex. A to Lee Decl., ECF No. 37); (Fowles Dep. 15:17–19). The parties disagree regarding whether the fence was locked, but regardless, Fowles entered the property. (Fowles Dep. 17:1–4).

The following account is taken from Fowles' deposition and disputed by Plaintiff with regards to its accuracy.[1] After entering, Fowles had walked about half-way down the driveway toward the front door when six large Rottweiler dogs came out from under a pool deck. (*Id.* 25:3–13). The dogs were barking, growling, and bearing their teeth, and "they fanned out and kind of started to form a circle around [Fowles]." (*Id.* 25:23–26:9). He first stopped walking, and then tried to use his baton to keep the dogs from him, but "they weren't phased by it." (*Id.* 25:25–26:7). He attempted to retreat and exit the property, however, one of the dogs got behind him, which blocked his escape. (*Id.* 25:18–26:18). He explained: "I was afraid one of these animals would grab my leg and bite me, and if I went to the ground, I was afraid these animals were going to jump on top of me and kill me." (*Id.* 26:19–22). Fowles said the dog "that was coming around behind [him] lunged," which is when he shot the dog. (*Id.* 26:25–27:1). Fowles estimated the dog was only "five or ten feet away," and he described "lunged" as "extended its head and shoulders forward at me with teeth bearing like it was going to bite me." (*Id.* 27:2–7).

Fowles shot the dog in the side, and the dog eventually passed away. (Photograph, Ex. 5 to Pl. Partial MSJ, ECF No. 38-5). Fowles contacted his supervisor and Animal Control, both of whom subsequently arrived at the property. (Fowles Dep. 23:4–10).

On April 4, 2013, Plaintiff filed a Voluntary Statement with the Nye County Sheriff's Office complaining of Fowles' actions. (Voluntary Statement, Ex. 3 to Pl. Partial MSJ, ECF

---

[1] Plaintiff was not present at the time, and there were no witnesses to the incident.

No. 38-3). Medina was assigned to perform an official investigation into the incident to determine if "Fowles was within policy and within the law when he discharged his firearm while he was on duty." (Medina Dep. 12:12–21, Ex. F to Lee Decl., ECF No. 37). Medina's assignment also included investigating Plaintiff's Voluntary Statement, or "written complaint." (*Id.* 12:21–22). As part of his investigation, Medina both visited Plaintiff's property and conducted an interview of Plaintiff and her significant other at Plaintiff's workplace. (*Id.* 14:19–21). Describing this interview, Plaintiff stated in her deposition that she "felt very intimidated" due to "[t]he way [Medina] talked," which she described as "rude" and "unprofessional." (Hardan Dep. 70:12, 73:18–74:4). Medina's investigation ultimately resulted in the exoneration of Fowles for his actions. (*See* Marshall Dep. 22:24–23:1, Ex. 8 to Pl. Resp., ECF No. 45-8). DeMeo stated in his deposition that he "signed off the investigation after reviewing it, and their determination was that the actions [Fowles] took was lawful." (DeMeo Dep. 59:2–6, Ex. 9 to Pl. Resp., ECF No. 49-9).

On March 13, 2015, Plaintiff filed the instant action in this Court. (*See* Am. Compl.). Plaintiff asserted the following causes of action: (1) 42 U.S.C. § 1983 violations of First, Fourth, and Fourteenth Amendments against Fowles and Medina; (2) 42 U.S.C. § 1983 *Monell* claims against Nye County, DeMeo, and Marshall; (3) negligence against all defendants; and (4) intentional infliction of emotional distress against all defendants. (*Id.*). Defendants filed a Motion for Partial Dismissal and Motion for a More Definite Statement (ECF No. 9), which the Court granted in part and denied in part, allowing Plaintiff to file an amended complaint (ECF No. 27). Plaintiff timely filed her Amended Complaint asserting the same causes of actions (ECF No. 28), and Defendants promptly filed an Answer (ECF No. 29). The parties then filed the instant Motion for Summary Judgment ("MSJ") and Partial Motion for Summary Judgment ("Partial MSJ"). (ECF Nos. 36, 38).

## II. **LEGAL STANDARD**

The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.* "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008) (citing *United States v. Shumway*, 199 F.3d 1093, 1103–04 (9th Cir. 1999)). A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, a court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24. If the moving party fails to meet its initial burden, summary judgment must be denied and

the court need not consider the nonmoving party's evidence. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth "specific facts" by producing competent evidence that shows a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. The nonmoving party's evidence is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. However, if the evidence of the nonmoving party is "merely colorable, or is not significantly probative, summary judgment may be granted." *See id.* at 249–50 (citations omitted).

## III. <u>DISCUSSION</u>

### A. Evidentiary Issues

In Defendants' Response to Plaintiff's Partial Motion for Summary Judgment ("Partial MSJ"), Defendants dispute the authenticity of the following exhibits attached as support for Plaintiff's Partial MSJ: Exhibit 2, a Nye County School District Suspected Child

Abuse/Neglect Report Form; Exhibit 5, a photograph of Plaintiff's dog; and Exhibit 7, the

IACCP Model Policy on Law Enforcement Encounters with Canines.[2] (Defs. Resp. 14:13–

15:22, ECF No. 41).  Specifically, Defendants argue that these three exhibits lack the requisite

foundation, specifically that they should have been introduced with an affidavit for

authentication. (*Id.*).  Further, for Exhibit 7, Defendants also contend that it is hearsay and

Plaintiff has failed to "present any evidence" to "invok[e] the learned treatise exception" for

reliability. (*Id.* 15:10–21).  As such, Defendants argue that under *Orr v. Bank of Am.*, 285 F.3d

764, 733 (9th Cir. 2002), these exhibits should not be considered as evidence in the Court's

consideration of the instant motions. (*Id.* 14:13–15:22).

Plaintiff devotes her entire Reply to these evidentiary issues. (*See* Pl. Reply 2:11 – 4:9,

ECF No. 46).  Plaintiff argues that the Orr opinion "was issued prior to the 2010 amendments

to the Federal Rules of Civil Procedure . . . [which] made significant modifications . . . and

introduced flexibility." (*Id.* 2:13–16).  Plaintiff cites the 2010 Advisory Committee comments

to Federal Rule of Civil Procedure ("FRCP" or "Rule") 56 to assert that it is sufficient at the

summary judgment stage for the proponent of the evidence "to explain the admissible form that

is anticipated [for trial]." (*Id.* 3:1–11).  Plaintiff further cites *Las Vegas Sands v. Nehme*, 632

F.3d 526, 532–33 (9th Cir. 2011) for the proposition that "the Ninth Circuit has expressly

disapproved of the District of Nevada refusing to consider exhibits provided by the parties at

summary judgment." (Pl. Reply 3:19–26).

Generally, unauthenticated documents cannot be considered in a motion for summary

judgment.  However, "the requirement that documents be authenticated through personal

---

[2] Defendants also dispute Exhibit 3, Plaintiff's Voluntary Statement, which Defendants claim "was not actually attached to Plaintiff's motion," or alternatively "was submitted to the Court on a restricted basis." (Defs. Resp. 14:20–15:2).  According to the docket entry for Plaintiff's motion, it appears that Exhibit 3 was restricted to Court-only access. (*See* ECF No. 38).  Having reviewed Exhibit 3, the Court notes that it is the same as Defendant's Exhibit D to their MSJ. (*See* Ex. D at 40–41, Defs. MSJ, ECF No. 36).  Accordingly, the Court finds Defendants' objection regarding Plaintiff's Exhibit 3 to be moot.

knowledge when submitted in a summary judgment motion 'is limited to situations where exhibits are introduced by being attached to an affidavit' of a person whose personal knowledge is essential to establish the document is what it purports to be—that it is authentic." *Nehme*, 632 F.3d at 533 (quoting *Orr*, 285 F.3d at 773). Under Rule 901(b)(4), "documents . . . could be authenticated by review of their contents if they appear to be sufficiently genuine." *Orr*, 285 F.3d at 778 n.24.

Here, the Court finds that the details within Exhibit 2 are consistent with Defendants' own assertions regarding the facts, specifically that elementary school Principal Jason Odegard filed a child abuse report on March 22, 2013, based on a complaint received by Plaintiff. (*Compare* Suspected Child Abuse Report Form *with* Fowles Dep. 11:5–13). As such, the Court finds that lack of authentication is not a reason to exclude Exhibit 2 from consideration in resolving these motions.

The Court is able to make similar connections for Exhibit 5, the photograph of Plaintiff's dog. The photograph depicts a dog lying lifeless on its side with a wound on the side facing up. Further, the dog appears to be the same breed and approximate size as Plaintiff's dog. The Court finds that these indicia are "sufficiently genuine" for authentication under FRE 901(b)(4), and the Court will consider the photograph for the instant motions.

Lastly, regarding Exhibit 7, Plaintiff intends to authenticate this Model Policy at trial by calling its "expert witness who relied upon [it]." (Pl. Reply 3:17–18). Without further foundation regarding the expert, though, the Court cannot find that this explanation suffices for the purposes of authenticity. Further, Plaintiff does not present any argument regarding hearsay. While Defendants suggest that the document might be a learned treatise, Plaintiff does not make this argument. Without more, the Court cannot find that Exhibit 7 is sufficiently reliable to overcome the rule against hearsay. Therefore, the Court excludes Exhibit 7 as lacking foundation and hearsay.

Accordingly, the Court will consider Plaintiff's Exhibits 2, 3, and 5 over Defendants' objection, but the Court will not consider Plaintiff's Exhibit 7 with respect to the instant motions.

**B. Section 1983 Claims and Qualified Immunity**

Plaintiff's first cause of action alleges a § 1983 violation of the First, Fourth, and Fourteenth Amendments against Fowles and Medina. First, Plaintiff alleges that Fowles committed an unreasonable search of her property by "unlawfully enter[ing] Plaintiff's yard" and an unreasonable seizure by "unreasonably executing" Plaintiff's dog. (Am. Compl. ¶¶ 28–29). Further, Plaintiff alleges that Medina "refused to investigate the violations of Plaintiff's civil rights, on the contrary, affirmatively covered-up the violations of Plaintiff's civil rights." (*Id.* ¶ 30). Plaintiff also alleges that Medina "showed up at Plaintiff's work and intimated her and dissuaded her from seeking redress against Nye County . . . in violation of [her] First Amendment rights." (*Id.*). Defendants argue in their MSJ that no genuine issue of material fact exists regarding the alleged constitutional violations, and regardless, they are entitled to qualified immunity. (Defs. MSJ 15:1–23:17).

Section 1983 actions involve the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. To bring a successful § 1983 claim, a plaintiff must allege (1) a violation of a constitutional right and (2) must show that the alleged violation was committed by "a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48–49 (1988). Moreover, § 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490 U.S. 386, 393–94 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)).

Under the doctrine of qualified immunity, if the court finds that the defendants committed a constitutional violation, then the court must determine whether these rights were clearly established at time of violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "The

doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al–Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). For a right to be clearly established, it is not necessary that a factually identical action has been held unlawful. It is sufficient if the state of the law at the time of the complained of conduct gave the officers fair notice that their actions were unlawful. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

"Although we must view the facts in the light most favorable to the nonmoving party, when considering qualified immunity, we are also limited to considering what facts the officer could have known at the time of the incident." *Estate of Lopez v. Gelhaus*, No. 16-15175, 2017 WL 4183595, at *6 (9th Cir. Sept. 22, 2017) (quoting *Davis v. United States*, 854 F.3d 594, 598 (9th Cir. 2017)). Ultimately, at summary judgment, the Court asks "whether the defendants would be entitled to qualified immunity as a matter of law, assuming all factual disputes are resolved, and all reasonable inferences are drawn, in plaintiff's favor." *Id.* (quoting *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013))

Here, Defendants concede that they were acting under color of law. (Def. MSJ 13:21–22, ECF No. 36). Thus, the Court must first determine if a genuine issue of material fact exists as to any of the asserted violations of Plaintiff's constitutional rights. If so, then the Court moves on to the second step of the qualified immunity analysis to determine if the rights were clearly established at the time of the violation.

### 1. Fowles' Entry onto Property

Each party seeks summary judgment in their favor that Fowles' entry onto Plaintiff's property constituted an unreasonable search. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "At [its] very core stands the right of a [person] to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v. United States*, 365 U.S. 505, 511 (1961). "[S]earches and seizures inside a home without a warrant are," therefore, "presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980).

The area "immediately surrounding and associated with the home"—the "curtilage"—is treated as "part of [the] home itself for Fourth Amendment purposes." *Oliver v. United States*, 466 U.S. 170, 180 (1984). Like searches and seizures inside the home itself, "searches and seizures in the curtilage without a warrant are also presumptively unreasonable." *United States v. Perea-Rey*, 680 F.3d 1179, 1184 (9th Cir. 2012). A police officer conducts a "search" within the meaning of the Fourth Amendment when the agent infringes "an expectation of privacy that society is prepared to consider reasonable," *United States v. Jacobsen*, 466 U.S. 109, 113 (1984), or "physically occupie[s] private property for the purpose of obtaining information," *United States v. Jones*, 565 U.S. 400, 404 (2012).

Fowles does not appear to dispute that he was on the curtilage of Plaintiff's property when he entered through the fence. (*See, e.g.*, Defs. MSJ 16:11–15) (discussing and acknowledging that Fowles entered the property). However, Fowles argues instead that he was present on Plaintiff's property not to conduct a search, but rather to ask Plaintiff questions regarding her complaint with the school. (*Id.* 16:11–16). As such, Fowles seeks to invoke the "knock and talk" exception to a warrantless entry in violation of the Fourth Amendment's protection from unreasonable searches. (*See id.* 15:8–16:24).

Almost fifty years ago, the Ninth Circuit stated the general rule regarding "knock and talk" encounters in the following passage:

> Absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's "castle" with the honest intent of asking questions of the occupant there of whether the questioner be a pollster, a salesman, or an officer of the law.

*Davis v. United States*, 327 F.2d 301, 303 (9th Cir. 1964), *impliedly overruled on other grounds by Perea-Rey*, 680 F.3d at 1187. "It remains permissible for officers to approach a home to contact the inhabitants. The constitutionality of such entries into the curtilage hinges on whether the officer's actions are consistent with an attempt to initiate consensual contact with the occupants of the house." *Perea-Rey*, 680 F.3d at 1187–88. Under the implied license afforded by the knock and talk rule, officers may "approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Florida v. Jardines*, 569 U.S. 1, 8 (2013); *see also United States v. Lundin*, 817 F.3d 1151, 1160 (9th Cir. 2016) ("An officer does not violate the Fourth Amendment by approaching a home at a reasonable hour and knocking on the front door with the intent merely to ask the resident questions."). This is because officers, like girl scouts selling cookies, generally have an implied license to walk up to a home and attempt to engage the occupant in conversation. *Perea-Rey*, 680 F.3d at 1187–88. Moreover, an "officer [initiating] a 'knock and talk' visit may approach any part of the building where uninvited visitors could be expected." *Id.* at 1188 (citation omitted).

"[O]nly objective factors lend themselves to analysis under the Fourth Amendment's reasonableness standard." *Perea-Rey*, 680 F.3d at 1187–88 (citing *Kentucky v. King*, 563 U.S. 452, 464 (2011)). The Supreme Court recently held that the "scope" of a "license [to enter the curtilage] . . . is limited not only to a particular area but also to a specific purpose." *Jardines*,

569 U.S. at 9. To determine if an entry onto curtilage violated the Fourth Amendment, the court examines the circumstances of the officer's approach, including the officer's purpose, and the homeowner's expectation of privacy, specifically if he or she took any actions to express a higher expectation of privacy. *See Madruga v. Cty. of Riverside*, 431 F. Supp. 2d 1049, 1057–58 (C.D. Cal. 2005) (citing *Davis*, 327 F.2d at 3030, to find that a homeowner could take precautions against any trespass by an uninvited visitor that would also preclude an officer's knock and talk from being reasonable).

Here, the Court finds that Fowles' purpose sufficed for the knock and talk exception because he went to Plaintiff's residence specifically to ask questions of the occupants. *See Lundin*, 817 F.3d at 1158. Fowles entered the property to obtain a formal statement from Plaintiff pursuant to the alleged child abuse complaint that she filed at her child's school. (*See, e.g.*, Fowles Dep. 14:9–19). The main dispute, however, is whether the gate enclosing Plaintiff's property was sufficient to preclude the implied license for Fowles or any uninvited visitors (including, for example, girl scouts) to enter the property. Fowles argues that he "entered through, what he perceived as an open gate, in order to approach the [r]esidence and knock on [Plaintiff's] front door." (Def. MSJ 16:17–18). He asserts that he "did not use any tools to enter the gate nor was he rebuffed in any way from entering the property." (*Id.* 16:18–19). Lastly, he argues that "there were no signage indicating the entry was prohibited, there were no mechanisms such as an intercom or bell that would put potential invitees on notice to seek permission prior to attempting entry; nor were there any obvious locking mechanisms such as a pad lock on the entrance gate." (*Id.* 16:20–23). As such, he urges the Court to find that his entry was reasonable, especially in light of his purpose for entering. (*Id.* 16:23–24).

Plaintiff responds that her "yard was completely fenced, gated, and enclosed and Fowles only made entry into the yard by breaking [Plaintiff's] locked gate." (Pl. Resp. 7:10–11, ECF

No. 45).[3]  While Plaintiff did not witness Fowles' entry, she asserts that she was told by a different officer that Fowles jumped the fence. (Hardan Dep. 47:22–48:3).  Plaintiff also argues that NRS 207.200 "provides that fencing a property is a sufficient warning against trespassing." (*Id.* 3:19–20).[4]

Regardless of the parties' dispute over whether the gate was locked,[5] the Court ultimately finds that Plaintiff's fence is sufficient under NRS 207.200 to demonstrate adequate warning against trespassing, or in other words, an "express order[] from the person in possession against any possible trespass." *Davis*, 327 F.2d at 303.  Thus, viewing the evidence in the light most favorable to Plaintiff, the Court finds that Fowles' entry onto Plaintiff's property in violation of NRS 207.200 was a constitutional violation.

Because the Court finds a constitutional violation for unlawful search in violation of the Fourth Amendment, the Court must next decide if the right was clearly established at the time of the violation. *Katz*, 533 U.S. at 201.  The Court finds that there was a clearly established statutory right of which a reasonable person would have known. *See Pearson*, 555 U.S. at 231.

---

[3] Plaintiff also argues that no exigent circumstances existed, Plaintiff was not suspected of committing a crime, and that "Fowles made no attempt to contact [Plaintiff] prior to entering her yard to alert [Plaintiff] of his presence or to obtain her consent." (Pl. Resp. 7:13–16).  First, Fowles is not arguing the exigent circumstances exception to warrantless entry, nor that he suspected Plaintiff of committing a crime.  Indeed, the latter goes to his proper purpose under the knock and talk, although "[a]n officer does not violate the Fourth Amendment by approaching a home at a reasonable hour and knocking on the front door with the intent merely to ask the resident questions, *even if the officer has probable cause to arrest the resident*." *Lundin*, 817 F.3d at 1160 (emphasis added).  Lastly, as to whether Fowles should have called Plaintiff ahead of time, "the appropriate inquiry is whether the officers acted reasonably, not whether they had less intrusive alternatives available to them." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994) ("Requiring officers to find and choose the least intrusive alternative would require them to exercise superhuman judgment.").  Further, Plaintiff acknowledged that she had some notice that the police would be contacting her to further investigate the claim because the elementary school informed her of such. (Hardan Dep. 39:15–40:23).
[4] NRS 207.200 states in relevant part: "A sufficient warning against trespassing, within the meaning of this section, is given by any of the following methods: . . . Fencing the area." Nev. Rev. Stat. 207.200(2)(c).
[5] The Court is not convinced that this fact is actually in dispute.  Fowles asserts that the gate was not locked, citing his deposition.  Plaintiff's only cited rebuttal evidence is also Fowles' deposition.  This deposition does not state that the gate was locked, rather Fowles stated that the property was fenced, the gate was closed, and he "[o]nly had to push the gate open." (Fowles Dep. 15:17–16:23).  Nevertheless, because of the Nevada trespass statute, the Court finds that this fact is not material.

Fowles knew or should have known that by entering the fenced area, he would be trespassing pursuant to NRS 207.200. In his deposition, he stated that he was familiar with the law, but not the particular provision regarding a fenced area. (Fowles Dep. 20:3–21:2). However, ignorance of the clearly established law is not an excuse under qualified immunity, as a statute provides for fair notice. *See Hope*, 536 U.S. at 741. Accordingly, the Court finds that Fowles is not entitled to qualified immunity. The Court denies both motions for summary judgment as to Fowles' alleged Fourth Amendment violation of unlawful search by entering Plaintiff's property.

### 2. Fowles' Shooting of Dog

Each party also seeks summary adjudication in their favor on the issue of whether Fowles' shooting of Plaintiff's dog constituted an unreasonable seizure. There is no question that Fowles seized the dog by shooting her. *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose* ("*Hells Angels*"), 402 F.3d 962, 975 (9th Cir. 2005) (killing a dog constitutes a seizure of property). Rather, the question is whether the seizure was reasonable. This reasonableness determination requires a balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing interests at stake." *Graham*, 490 U.S. at 396 (internal citations and quotation marks omitted). "A seizure becomes unlawful when it is 'more intrusive than necessary.'" *Ganwich v. Knapp*, 319 F.3d 1115, 1122 (9th Cir. 2003) (quoting *Florida v. Royer*, 460 U.S. 491, 504 (1983)). The court must examine "the totality of the circumstances to determine whether the destruction of property was reasonably necessary to effectuate the performance of the law enforcement officer's duties." *Hells Angels*, 402 F.3d at 975 (citing *Deorle v. Rutherford*, 272 F.3d 1272, 1279 (9th Cir. 2001)). The Supreme Court has warned that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second

judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.

Here, the Court finds that there exists a genuine issue of material fact regarding whether the seizure was reasonable. Although Fowles asserts extensive explanation in his deposition that he did not know of the dogs' presence and he feared for his life (*see, e.g.*, Fowles Dep. 25:3–27:21, 55:20–21), the Ninth Circuit has cautioned that "[t]he court may not simply accept what may be a self-serving account by the police officer." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). Rather, the court "must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably." *Id.* "[I]n assessing reasonableness under the Fourth Amendment an appropriate factor is whether the officer considered alternatives before undertaking intrusive activity implicating constitutional concerns." *Hells Angels*, 402 F.3d at 977 (citing *Chew v. Gates*, 27 F.3d 1432, 1440 n.5 (9th Cir. 1994)).

"[D]ogs are more than just a personal effect. The emotional attachment to a family's dog is not comparable to a possessory interest in furniture." *Hells Angels*, 402 F.3d at 975 (internal citation omitted). However, the Ninth Circuit has also indicated that "the governmental interest of safety might have provided a sound justification for the intrusion had the officers been surprised by the presence of the dogs." *Id.* at 977.

Here, Plaintiff argues "the photograph of Roxy which demonstrates that she was shot through the side contradicts Defendant Fowles self-serving testimony that Roxy 'lunged' at him." (Pl. Resp. 9:9–10). Fowles was asked about this in his deposition:

> Q. How did the dog lunge at you if it was if you shot at the side?
> A. Well, it was as it was -- as it was walking around, it was kind of -- more kind of towards my right side area. It was at -- it was at an angle toll me. It wasn't straight on.

(Fowles Dep. 44:12–17). Plaintiff also argues that Fowles could have chosen to "use alternatives to deadly force." (Pl. Resp. 9:17–18). Fowles explains in his deposition that he attempted to use other alternatives – first, he stopped walking forward, then when that did not work, he took out his baton out and extended it. (Fowles Dep. 25:14–26:1). Fowles also explained that while he had pepper spray, he did not use it because he was concerned about self-contamination, which would have made everything worse in his opinion. (*Id.* 27:25–28:20). The Court finds that these points create a genuine issues of material fact regarding whether Fowles shot Plaintiff's dog because he was in fear for his safety and whether he could have used alternative measures.[6]

Viewing the evidence in the light most favorable to Plaintiff, Fowles violated her Fourth Amendment rights regarding the shooting of her dog for the purposes of the first step in the qualified immunity analysis. Therefore, the Court moves on to the second step to determine whether the constitutional right was clearly established.

Clearly established law demonstrates that "the killing of a person's dog constitutes an unconstitutional destruction of property absent a sufficiently compelling public interest." *Hells Angels*, 402 F.3d at 977 (citing *Fuller v. Vines*, 36 F.3d 65, 68 (9th Cir. 1994), *overruled on other grounds*, *Robinson v. Solano County*, 278 F.3d 1007, 1013 (9th Cir. 2002)).[7] However, the genuine issue of material fact here is whether there was a sufficiently compelling public interest, specifically whether Fowles' safety was at risk, and whether less intrusive alternatives

---

[6] The Court notes, with regard to the potential alternative measures, the relevant factor regarding reasonableness is the "availability of *less* intrusive force" because Fowles "need not [have] employ[ed] the *least* intrusive means available." *See Gelhaus*, 2017 WL 4183595, at *5 (citing *Hughes v. Kisela*, 841 F.3d 1081, 1085 (9th Cir. 2016)) (emphasis added).

[7] Defendant argues that *Hells Angels* is factually distinguishable because the officers knew about the dogs prior to executing the search warrants and failed to develop a non-lethal strategy for immobilizing them, whereas here, Fowles was surprised by the dogs' presence. (*See* Defs. Reply 12:10–13:4, ECF No. 49). However, this version of the facts views them in the light most favorable to Fowles. Further, the case that clearly establishes the law need not be directly on point as long as existing precedent placed the question beyond debate. *Ashcroft*, 563 U.S. at 741.

existed.  Viewing the facts in the light most favorable to Plaintiff, the Court cannot find that Fowles is entitled to qualified immunity. *See Gelhaus*, 2017 WL 4183595, at \*6 (defendant is only entitled to qualified immunity as a matter of law if all disputed facts and reasonable inferences are drawn in plaintiff's favor).

Drawing all inferences in favor of Plaintiff, the Court cannot find that Fowles' conduct was objectively reasonable, regardless of his need to make split-second judgments. *See Graham*, 490 U.S. at 396–97; *see also Gelhaus*, 2017 WL 4183595, at \*6.  This further justifies the Court's denial of qualified immunity to Fowles based on the facts presently before the Court.

Accordingly, the Court denies both motions for summary judgment as to Fowles' alleged Fourth Amendment violation of unlawful seizure by shooting Plaintiff's dog.

### 3. Medina's Investigation as Retaliation

Deliberate retaliation by state actors against an individual's exercise of her First Amendment right to petition the government for redress of grievances is actionable under § 1983. *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989).  To demonstrate retaliation in violation of the First Amendment, a plaintiff must prove: (1) a defendant took action that would chill a person of ordinary firmness from future First Amendment activities, and (2) the defendant would not have taken the action but for the defendant's desire to chill plaintiff's speech. *Skoog v. Cty. of Clackamas*, 469 F.3d 1221, 1232 (9th Cir. 2006).

Plaintiff's Amended Complaint alleges that "Medina showed up at Plaintiff's work and intimidated her and dissuaded her from seeking redress against Nye County by yelling at her and saying words intended to prevent the Plaintiff from petitioning her government concerning their misconduct." (Am. Compl. ¶ 30).  In seeking summary judgment, Medina argues that he "vigorously investigated the alleged misconduct of [Fowles] and never attempted to intimidate

[Plaintiff] from filing a complaint." (Defs. MSJ 22:14–16). Medina specifically asserts that as part of his review of Fowles' conduct, he "independently visited" Plaintiff's property, interviewed the Animal Control officer who came to the scene after the shooting, and "he traveled to [Plaintiff's] place of employment to interview [Plaintiff and her significant other], which abruptly ended when [Plaintiff] exited the interview." (*Id.* 22:24–23:5). Therefore, Medina argues that Plaintiff "refused to participate" and "any obligation [Medina] had to investigate the purported misconduct of [Fowles] was satisfied," regardless of whether Plaintiff was displeased by "Medina's ultimate conclusion or the subsequent exoneration of [Fowles]." (*Id.* 23:5–9).

Plaintiff responds that during the interview with Medina at her place of employment, "Medina immediately took an adversarial tone, rather than attempting to determine what actually occurred." (Pl. Resp. 10:17–18). When Plaintiff's significant other indicated his intention to speak with a lawyer, Plaintiff considered Medina's response "dismissive[]." (*Id.* 10:18–23). Plaintiff therefore argues that "a reasonable juror could determine that Defendant Medina merely sought to defend the actions of Defendant Fowles and dissuade [Plaintiff] from pursuing a claim against Nye County." (*Id.* 10:23–25).[8]

Viewing the facts in the light most favorable to Plaintiff, the Court finds that Plaintiff's assertions regarding Medina's adversarial tone and dismissive responses would not rise to a constitutional violation because no reasonable juror would find that this response would "chill a person of ordinary firmness" from filing a court action. *See Skoog*, 469 F.3d at 1232. While Plaintiff states in her deposition that she "felt very intimidated," she also stated that the

---

[8] The parties believe that they have submitted a recording of this interview between Medina, Plaintiff, and Plaintiff's significant other to the Court. (*See* Defs. MSJ 8:11 n.58); (Pl. Resp. 10:17 n.4). However, Defendants' Exhibit C is a recording of an interview between Medina and Fowles, not Plaintiff. (Ex. C to Defs. MSJ, ECF No. 36). As such, the Court does not have the recording in question to consider, and the Court can only consider the parties' versions of this encounter as told in their depositions. Nevertheless, the Court finds that this claim can be resolved without access to the recording.

intimidation was due to "[t]he way he talked," which she described as "rude" and "unprofessional." (Hardan Dep. 70:12, 73:18–74:4). The Court finds no genuine issue of material fact exists that rudeness or unprofessionalism would "chill a person of ordinary firmness." Further, Plaintiff fails to provide a similar case as clearly established law to demonstrate that an indifferent or even argumentative police interview to follow up on a citizen's complaint amounts to a First Amendment constitutional violation. *See Shoshone-Banncock Tribes v. Fish & Game Comm'n*, 42 F.3d 1278, 1285 (9th Cir. 1994) ("Where the defendant raises the affirmative defense of qualified immunity, the initial burden is upon the plaintiff to show that the rights were clearly established, after which the defendant bears the burden of proving that his conduct was reasonable."); *Lacey v. Maricopa Cty.*, 693 F.3d 896, 915 (9th Cir. 2012) (the court has the "discretion to decide which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand") (internal quotation marks omitted).

Accordingly, the Court grants Defendants' MSJ as to Medina on Plaintiff's First Amendment claim.

### C. *Monell* Claims

Plaintiff's second cause of action alleges *Monell* claims against Defendants Nye County, DeMeo, and Marshall. (Am. Compl. ¶¶ 35–43). Pursuant to *Monell*, municipalities can be sued directly under § 1983 for violations of constitutional rights. *See Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). As explained by the Ninth Circuit, a litigant may recover from a municipality under § 1983 on one of three theories of municipal liability. *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1249 (9th Cir. 2010). "First, a local government may be held liable 'when implementation of its official policies or established customs inflicts the constitutional injury.'" *Id.* (quoting *Monell*, 436 U.S. at 708 (Powell, J. concurring)). "Second, under certain circumstances, a local government may be held liable

under § 1983 for acts of omission, when such omissions amount to the local government's own official policy." *Id.* "Third, a local government may be held liable under § 1983 when 'the individual who committed the constitutional tort was an official with final policy-making authority' or such an official 'ratified a subordinate's unconstitutional decision or action and the basis for it.'" *Id.* at 1250 (quoting *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992)). These three theories are sometimes referred to as (1) commission, (2) omission, and (3) ratification, respectively. *See, e.g.*, *Aranda v. City of McMinnville*, 942 F. Supp. 2d 1096, 1109 (D. Or. 2013).

First, liability for an informal or *de facto* policy arises "when a plaintiff can prove the existence of a widespread practice that, although not authorized by an ordinance or an express municipal policy, is 'so permanent and well settled as to constitute a custom or usage with the force of law.'" *Castro v. Cty. of Los Angeles*, 797 F.3d 654, 671 (9th Cir. 2015) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)). A plaintiff may attempt to prove the existence of such an informal policy with "evidence of repeated constitutional violations for which the errant municipal officials were not discharged or reprimanded." *Gillette*, 979 F.2d at 1349. Here, however, Plaintiff has failed to present any evidence demonstrating a "*de facto* policy to allow the unreasonable use of deadly force upon dogs." (*See* Pl. Resp. 16:1–2). Plaintiff does not provide any examples of other instances where Nye County failed to train an officer and as a result deadly force was used against a dog or other animal. (*See* Pl. Partial MSJ 11:1–8); (Pl. Resp. 13:16–23). Nor does Plaintiff present any evidence for crucial elements of her allegations, such as the duration of the alleged policy or that any official helped to formulate or was even aware of the alleged policy not to train its officers. *See Gillette*, 979 F.2d at 1349 (upholding summary judgment on a *Monell* claim because plaintiff failed to present "any evidence as to how long this alleged informal policy existed," or "that the City Manager or the City Council helped formulate or were aware that any such informal policy existed.").

Accordingly, Plaintiff's unsubstantiated allegations of a "*de facto* policy of not training its officers concerning canine encounters" are insufficient for her *Monell* claim regarding a custom or policy to survive summary judgment.

However, the Court agrees that a genuine issue of material fact remains regarding Plaintiff's *Monell* ratification claim. "To show ratification, a plaintiff must prove that the authorized policymakers approve a subordinate's decision and the basis for it." *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999). "[A] single decision by a municipal policymaker is sufficient to trigger section 1983 liability under *Monell*, even though the decision is not intended to govern future situations." *Gillette*, 979 F.2d at 1347 (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986)). Evidence of this decision must demonstrate "a conscious, affirmative choice." *Id.* "If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *Praprotnik*, 485 U.S. 112, 127 (1988).

Here, Plaintiff provides evidence that Nye County "investigated the allegations against Fowles and 'exonerated' him for his actions." (Pl. Resp. 14:10–11); (*see also* Marshall Dep. 22:24–23:1). Although Plaintiff does not provide a copy of the "Notice of Findings" referred to in Marshall's deposition, the Court finds that Marshall's acknowledgement of the document and its finding of exoneration is sufficient to demonstrate a genuine issue of material fact regarding his approval. Further, Plaintiff provides evidence that DeMeo also "'signed off' on the propriety of Fowles [sic] actions." (Pl. Resp. 14:12–13). DeMeo stated in his deposition: "I signed off the investigation after reviewing it, and their determination was that the actions Deputy Fowles took was lawful." (DeMeo Dep. 59:2–6). Defendants' rebuttal argument centers upon the overall lawfulness of Fowles and Medina's actions. (*See* Defs. MSJ 27:1–8); (Defs. Resp. 27:12–24); (Defs. Reply 16:22–28, ECF No. 49).[9]

---

[9] The parties do not appear to dispute that Marshall and DeMeo are authorized policymakers.

The Court finds that Plaintiff has provided sufficient evidence to demonstrate a genuine issue of material fact regarding Marshall and DeMeo's approval of Fowles' actions. Should a jury ultimately find that Fowles' actions were lawful, then the ratification issue would be moot. However, the Court cannot grant summary judgment to either party because the lawfulness of Fowles' actions—both entering Plaintiff's property and shooting Plaintiff's dog— remains a genuine issue of material fact. Nevertheless, the Court grants summary judgment on Plaintiff's *Monell* ratification claim as to Medina's actions, which the Court found did not rise to the level of a constitutional violation. (*See supra* Part III.A.3.).

### D. State Law Claims

Plaintiff's third and fourth causes of action allege state law claims against all defendants for negligence and intentional infliction of emotion distress, respectively. (Am. Compl. ¶¶ 44–61). Defendants contend that they are entitled to summary judgment on both of Plaintiff's state law claims because Plaintiff fails to meet each tort's elements and the claims are also barred by Nevada's discretionary-act immunity statute. (*See* Defs.' MSJ 27:17–30:10).

#### 1. Negligence

Plaintiff's negligence cause of action is essentially three separate claims, one for Fowles' allegedly negligent use of excessive or unreasonable force against Plaintiff's dog, one for Medina's alleged retaliatory interference with Plaintiff's right to petition, and one against Nye County, DeMeo, and Marshall for negligence in making policy and ensuring officers comply with training, or in other words, policymaking, training, and supervision. (Am. Compl. ¶ 47–48); (*see also* Pl. Resp. 16:24–17:8).

Nevada's general waiver of sovereign immunity contains exceptions, and one of those exceptions is that no negligence action may be brought against an officer or employee of Nevada "[b]ased upon the exercise or performance or the failure to exercise or perform a discretionary function or duty . . . whether or not the discretion involved is abused." Nev. Rev.

Stat. § 41.032(2); *see also Franchise Tax Bd. of Cal. v. Hyatt*, 335 P.3d 125, 139 (Nev. 2014)

("[D]iscretionary-function immunity under NRS 41.032 does not include intentional torts and

bad-faith conduct"). Nevada looks to federal law regarding the Federal Tort Claims Act (the

"FTCA") when analyzing claims of discretionary act immunity, and has adopted the *Berkovitz–*

*Gaubert* test for determining whether a decision falls within the scope of that immunity.

*Martinez v. Maruszczak*, 168 P.3d 720, 727–29 (Nev. 2007); *see also Butler ex rel. Biller v.*

*Bayer*, 168 P.3d 1055, 1066 n.50 (Nev. 2007) ("The discretionary-act immunity provision

contained in NRS 41.032(2) is 'virtually identical' to the discretionary-act immunity provision

found in the [FTCA], 28 U.S.C. § 2680(a) (2000)."). Under that test, in order to qualify for

discretionary-act immunity, "a decision must (1) involve an element of individual judgment or

choice and (2) be based on considerations of social, economic, or political policy." *Id.* at 729.[10]

The Supreme Court of Nevada further clarified that "decisions at all levels of government,

including frequent or routine decisions, may be protected by discretionary-act immunity, if the

decisions require analysis of government policy concerns." *Id.* The focus of this test is not a

police officer's "subjective intent in exercising the discretion conferred by statute or regulation,

but on the nature of the actions taken and on whether they are susceptible to policy analysis."

*Id.* at 728.

For the first claim against Fowles for negligent use of excessive force against Plaintiff's

dog, genuine issues of material fact discussed above preclude a determination on the merits.

(*See supra* Part III.B.1.–2.); *see also Vasquez-Brenes v. Las Vegas Metro. Police Dep't*, 51 F.

Supp. 3d 999, 1014 (D. Nev. 2014) ("Because genuine issues of material fact exist regarding

---

[10] In *Martinez*, the Nevada Supreme Court adopted the *Berkovitz–Gaubert* test in order to "clarify the test for evaluating claims of discretionary-function immunity," and thereby superseded the two other tests Nevada courts had been applying prior to *Martinez*: the planning-versus-operational test and the discretionary-versus-ministerial test. *Martinez*, 168 P.3d at 726–28; *see Hyatt*, 335 P.3d at 135 ("When this court adopted the federal test in *Martinez*, we expressly dispensed with the earlier tests used by this court to determine whether to grant a government entity or its employee immunity").

whether officer Miller properly and adequately assessed the need to detain, arrest, and use force or deadly force against Brenes, the court must deny defendants' motion for summary judgment on plaintiffs' negligence claim."). Further, the Court finds that this negligence claim is not barred by NRS § 41.032(2). One limitation to the application of discretionary-act immunity is that the alleged action cannot violate the Constitution or some other legal mandate. *See Mirmehdi v. United States*, 689 F.3d 975, 984 (9th Cir. 2011) (finding that the decision to detain an individual pending the outcome of immigration proceedings fell within the FTCA's discretionary function exception, which mirrors Nevada's discretionary-act immunity test, because the plaintiffs failed to "allege that this decision itself violated the Constitution"); *Nurse v. United States*, 226 F.3d 996, 1002 (9th Cir. 2000) (stating in applying the FTCA's discretionary function exception that "in general, governmental conduct cannot be discretionary if it violates a legal mandate"). Here, there remains a genuine issue of material fact concerning whether Fowles' conduct violated the Fourth Amendment of the Constitution. (*See supra* Part III.B.1.–2.). Therefore, discretionary-act immunity does not apply to bar Plaintiff's claim. *See Koiro v. Las Vegas Metro. Police Dep't*, 69 F. Supp. 3d 1061, 1074–75 (D. Nev. 2014) (denying discretionary-act immunity for an officer's use of force because Plaintiff "alleged that [the officer's] use of force violated his constitutional rights").

Second, regarding Medina's alleged retaliatory interference with Plaintiff's right to petition, the Court finds that Medina is entitled to discretionary-act immunity. "A law enforcement officer is generally afforded discretionary-function immunity in conducting an investigation and effectuating an arrest so long as the officer does not violate a mandatory directive in doing so." *Sandoval v. Las Vegas Metro. Police Dept.*, 854 F. Supp. 2d 860, 880 (D. Nev. 2012); *see also Sabow v. United States*, 93 F.3d 1445, 1453 (9th Cir.1996) ("Investigations by . . . law enforcement officials . . . clearly require investigative officers to consider relevant political and social circumstances in making decisions about the nature and

scope of [their] investigation."). Because Medina was conducting an investigation in his official capacity, the investigation involved both individual judgment and considerations of social and political policy, thus satisfying NRS § 41.032(2). As noted previously, a law enforcement officer may lose this immunity if he violates a constitutional or statutory right because the act is no longer considered discretionary. *See Nurse*, 226 F.3d at 1002. However, as the Court found above, Medina's investigation did not violate Plaintiff's constitutional rights. (*See supra* Part III.B.3.). Therefore, Medina is entitled to summary judgment on Plaintiff's negligence claim against him.

Lastly, the Court finds that Plaintiff's claim against Nye County, DeMeo, and Marshall for negligence in policymaking, training, and supervision is barred by NRS § 41.032(2). Decisions on how to properly train and supervise an officer involve individual judgment on the part of the policymakers or supervisors and are based on considerations of social, economic, or political policy. *Vickers v. United States*, 228 F.3d 944, 950 (9th Cir. 2000) ("[D]ecisions relating to the hiring, training, and supervision of employees usually involve policy judgments of the type Congress intended the discretionary function exception to shield."). Further, policymaking fits squarely within NRS § 41.032(2), as it involves individual decisions affecting social or political policy. Plaintiff fails to produce any evidence or even provide any argument to the contrary in her briefings. (*See* Pl. Resp. 19:22–20:7). Accordingly, the Court finds that Nye County, DeMeo, and Marshall are entitled to summary judgment on Plaintiff's negligence claim against them.

### 2. Intentional Infliction of Emotional Distress

Plaintiff's intentional infliction of emotional distress ("IIED") cause of action is also essentially two separate claims, one for Fowles' alleged intentional warrantless entry onto Plaintiff's property and the other for Medina's alleged intentional intimidation of Plaintiff. To establish a cause of action for IIED under Nevada law, a plaintiff must prove: "(1) extreme and

outrageous conduct with either the intention of, or reckless disregard for, causing emotional

distress, (2) the plaintiff's having suffered severe or extreme emotional distress and (3) actual

or proximate causation." *Olivero v. Lowe*, 995 P.2d 1023, 1025 (Nev. 2000). "[E]xtreme and

outrageous conduct is that which is outside all possible bounds of decency and is regarded as

utterly intolerable in a civilized community." *Maduike v. Agency Rent-A-Car*, 953 P.2d 24, 26

(Nev. 1998) (quotation omitted). "Liability for emotional distress generally does not extend to

mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Burns v.

Mayer*, 175 F. Supp. 2d 1259, 1268 (D. Nev. 2001) (quotations omitted). To establish severe

emotional distress, the plaintiff must demonstrate that "the stress [is] so severe and of such

intensity that no reasonable person could be expected to endure it." *Alam v. Reno Hilton Corp.*,

819 F. Supp. 905, 911 (D. Nev. 1993).

 Plaintiff has failed to present evidence or argument that she suffered extreme emotional

distress as a result of either Fowles or Medina's actions.[11]  Therefore, the Court will grant

Defendants' MSJ on Plaintiff's IIED cause of action.

## IV. <u>CONCLUSION</u>

 **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (ECF

No. 36) is **GRANTED in part, DENIED in part**.  Plaintiff's first cause of action remains

against Fowles for both the alleged unlawful search and unlawful seizure, but it is dismissed as

---

[11] Plaintiff argues that Fowles' deposition supports her claim of severe emotional distress because he describes her hysteria.  However, Plaintiff specifically contends: "[W]hen [she] saw that Fowles had killed Roxy she 'was completely hysterical.'" (Pl. Resp. 17:20 – 21) (quoting Fowles Dep. 54:14–18).  This explanation demonstrates that it was the shooting of Plaintiff's dog, not the entry onto her property, that caused Plaintiff's hysteria.  In ruling on Defendant's Motion to Dismiss, the Court found that NRS § 41.740 precludes Plaintiff from recovering punitive and noneconomic damages for emotional distress related to the death of her dog. (*See* Order on Mot. to Dismiss 5:7–15, ECF No. 27).  The Court allowed Plaintiff leave to amend this claim, but warned that "if Plaintiff again alleges emotion distress relating to the shooting of her dog, this claim will then be dismissed with prejudice." (*Id.* 5:16–17).  When Plaintiff amended her complaint, she removed all allegations regarding her dog, and focused her claim on Fowles' entry onto her property and Medina's alleged intimidation. (*See* Am. Compl. ¶¶ 53–56).  However, Plaintiff did not present evidence specifically relating to severe emotional distress from these two incidents such that a reasonable jury, drawing all inferences in her favor, could find for her on this claim. *See Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008).

to Medina. Plaintiff's second claim remains against Nye County, DeMeo, and Marshall only under the *Monell* ratification theory. Plaintiff's third claim of negligence remains only against Fowles. Plaintiff's fourth claim of intentional infliction of emotional distress is dismissed as to all defendants. Medina is dismissed as a defendant from this action.

      **IT IS FURTHER ORDERED** that Plaintiff's Partial Motion for Summary Judgment (ECF No. 38) is **DENIED**.

      **IT IS FURTHER ORDERED** that the parties shall file their Joint Pretrial Order by October 27, 2017. Additionally, pursuant to District of Nevada Local Rule 16-5, this case is **REFERRED** to Magistrate Judge Peggy A. Leen for a settlement conference.

      **DATED** this __28__ day of September, 2017.

_____
Gloria M. Navarro, Chief Judge
United States District Court